# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs November 1, 2016

## IN RE LA'TRIANNA W., ET AL.

**Appeal from the Juvenile Court for Knox County**
**No. 93877     Timothy E. Irwin, Judge**

_____

### No. E2016-01379-COA-R3-PT-FILED-DECEMBER 15, 2016
_____

This is a termination of parental rights case.  Appellant/Mother appeals the trial court's termination of her parental rights to two minor children on the ground of mental incompetence and on its finding that termination of Appellant's parental rights is in the children's best interests.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

Ben H. Houston, II, Knoxville, Tennessee, for the appellant, La'Treese W.

Herbert H. Slatery, III, Attorney General and Reporter, and M. Cameron Himes, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. Background

This case involves two minor children, La'Trianna W. (born May 2012) and La'Skylar W. (born June 2015).[1]  Both children were born out of wedlock to La'Treese W. ("Mother" or "Appellant").  The Tennessee Department of Children's Services ("DCS" or "Appellee") became involved with this family in August 2013, when it

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

received a referral that La'Trianna had been seen at a local hospital.[2]  The child was reported to be malnourished and dirty.  Shortly thereafter, DCS placed services in the home.  However, in December of 2013, DCS received a second report of harm, alleging that Mother had intellectual delays and was unable to properly care for the child.  When DCS visited the home in December of 2013, La'Trianna wore only a diaper, and Mother failed to properly dress the child after being prompted by the DCS case manager.  The case manager noted that the family was "basically living in one room with an electric skillet, a griddle and a fryer within reach of the child."  DCS made arrangements for additional in-home services to assist Mother.

On March 20, 2014, DCS filed a petition in the Juvenile Court for Knox County ("trial court") to remove La'Trianna from Mother's home.  The trial court removed La'Trianna to protective custody on the same day.  On June 16, 2014, the trial court entered an agreed order adjudicating La'Trianna as a dependent and neglected child based on environmental neglect, lack of supervision, domestic violence, and mental health issues of the parent.

After La'Trianna was removed from her custody, Mother lived with several men.  Mother told the DCS case manager, Leaha Burke, that she frequently met men at the bus station or the public library, moved them into her apartment, and engaged in sexual relationships with them.  At DCS's behest, Mother also completed a psychological evaluation.  The intake form notes that Mother appeared inappropriately dressed and smelling of body odor.  During the evaluation, Mother blamed her boyfriends or the lies of the person(s) who reported her to DCS for the child's removal.  Mother's IQ was determined to be 66, which indicates that she is functioning within a mentally challenged range of intelligence.  The evaluation noted that Mother is likely to struggle with the basic tasks of daily living and will need continued support especially when dealing with the complicated challenges of raising a child.

In the Fall of 2014, Mother became pregnant with La'Skylar, who was born in June of 2015.  Mother told Ms. Burke that she met La'Skylar's father on the street near the public library and that the couple had intercourse in a public park that day.  After La'Trianna was removed from her custody, Mother attended vocational counseling; however, she stopped attending during her pregnancy with La'Skylar.  Mother also completed a parenting assessment with a licensed professional counselor.  The assessment concluded that Mother "did not have the ability to be attuned to, anticipate, acknowledge and appropriately meet the complex and demanding needs of parenting a child."  The counselor noted that Mother makes decision in the interests of her own

---

[2] At that time, Mother was living with La'Trianna's biological father.  His parental rights were terminated by separate order entered on September 22, 2015, and he has filed a separate appeal to this Court. *See In re La'Trianna W.*, No. E2016-01322-COA-R3-PT.  Father's appeal does not bear on our adjudication of this case.

emotional and physical needs, which often puts the children at risk.

During Mother's pregnancy with La'Skylar, Mother frequently moved residences. Mother would stay at her own apartment until the utilities were turned off for nonpayment, then move to her grandmother's house. At her grandmother's house, Mother fought with her sister and left her grandmother's house to live with La'Trianna's father, who has a history of domestic violence against Mother. Eventually, Mother returned to live in her apartment. At her apartment, Mother continued to move men into her residence and engage in sexual relationships with them. These paramours included a man whom Mother met at a bus station, a man whom Mother met on a social media website, and a man who followed Mother home and began bringing stolen property into her apartment. Mother also allowed a woman, who was attempting to leave a violent relationship involving illegal drugs, to live in her apartment. After Mother gave birth to La'Skylar in June of 2015, she left the hospital to live with her grandmother.

DCS provided Mother with therapeutic visitation with La'Trianna; however, the record indicates that Mother struggled to develop a relationship with the child. Renee Stegall, a therapist who supervised the interaction between Mother and the children, stated that Mother required frequent prompting concerning proper parenting skills, but still experienced problems "remaining engaged with [La'Trianna], not understanding the age appropriate limitation that La'Trianna had during visits, [and] expect[ing] her to do more than she was able to do." Ms. Stegall testified that she would not recommend that Mother have unsupervised parenting time with La'Trianna. When La'Skylar was born, Mother's interactions with La'Trianna worsened. Mother focused on the younger child and had to be prompted to interact with La'Trianna. Mother could not remember or retain any of the information she received through the visitation. Caseworker, Leigh Anne Goldstine, who conducted the visits, opined that, without a structured environment, Mother could not care for the children on her own.[3] Ms. Goldstine also was concerned by the fact that Mother made dangerous decisions in moving strangers into her residence and that Mother failed to understand that these decisions placed Mother at risk of harm and endangered the children.

On March 3, 2015, DCS filed a petition to terminate Mother's parental rights to La'Trianna. On June 17, 2015, DCS filed a second petition to terminate Mother's parental rights to La'Skylar. As grounds, for both petitions, DCS averred that Mother was incompetent to care for the children and that the conditions that led to the children's removal from Mother's home still persisted despite DCS's reasonable efforts to help her. The petitions to terminate Mother's parental rights to La'Trianna and La'Skylar were consolidated and heard by the trial court on July 23, 2015.

---

[3] There is dispute in the record as to the proper spelling of Ms. Goldstine's name. For consistency and clarity, we will use the spelling set out in the trial court's order and Ms. Goldstine's signature, "Leigh Anne Goldstine."

On August 17, 2015, before the trial court entered an order on the hearing, Mother filed two separate notices of appeal (discussed *infra*) to the Circuit Court of Knox County. After the appeal was filed in the circuit court, the trial court entered an order terminating Mother's parental rights to the two children on September 22, 2015. The trial court found, by clear and convincing evidence, that Mother was

> incompetent to adequately provide for the further care and supervision of the children because [Mother's] mental condition is presently so impaired and is so likely to remain impaired that it is unlikely that [Mother] will be able to assume the care and responsibility of the children in the near future.

Following entry of the September 22, 2015 order terminating her parental rights, Mother took no further action to appeal the trial court's decision. However, on or about March 31, 2016, the circuit court entered an order, stating, in relevant part, that:

> [Mother's] notice of appeal [i.e., the first August 17, 2015 notice of appeal to the circuit court] indicated that both appeals, the first concerning the finding that the minor children were dependent and neglected and the second appealing the termination of the parent's parental rights, were done on the same Notice. Accordingly, [Mother's] appeal of the termination of [her] parental rights was not sent to the Court of Appeals. This Court does not have jurisdiction to hear the [termination of parental rights] matter. Jurisdiction for th[e] appeal [of the order terminating Mother's parental rights] lies in the Court of Appeals. This error was not caught by the . . . Circuit Court Clerk or this Judge until it was recently pointed out by the [DCS's] attorney.
>
> Based on the foregoing findings, [the circuit court] now Orders as follows:
>
> 1. The . . . appeal of the termination of . . . parental rights shall be transferred to the Court of Appeals, having exclusive jurisdiction for the determination of that issue.
> 2. The . . . Circuit Court Clerk is directed to make a certified copy of the Notice of Appeal that was filed in the Juvenile Court and transmitted to this Court as part of the Juvenile Court record, and forward it, along with a certified copy of this Order, to the Court of Appeals.
> 3. That the Order be sent to the Clerk of the Knox County Juvenile Court to alert them to the need to prepare and send to the Court of Appeals the record for the appeal of the termination of parental rights.
> 4. This case is set for trial in [the circuit court] on August 3, 2016, as to the issue of Dependent and Neglect.

Mother's first August 17, 2015 notice of appeal was transmitted to this Court and

stamped "Received" on July 6, 2016.

## II. Issues

Appellant raises the following issues for review, as stated in her brief:

1. The trial [c]ourt erred by terminating… the parental rights of the Mother for mental incompetence pursuant to Tenn. Code. Ann. § 36-1-113(g)(8).

2. The trial [c]ourt erred by finding that a termination of the Mother's parental rights was in the best interests of her children.

DCS raises the following additional issue:

1. This Court lacks jurisdiction because Mother did not timely file her notice of appeal.

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the children's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the children's best interests must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable ... and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the

evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id.*** at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002).

## IV.  Notice of Appeal

We will first address Appellee's issue concerning the timeliness of Appellant's notice of appeal. DCS argues that Mother's appeal was not timely filed pursuant to Tennessee Rule of Appellate Procedure 4(a), which provides, in relevant part: "In an appeal as of right to the… Court of Appeals…, the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from…." As discussed above, by order of December 10, 2014, the trial court declared La'Trianna to be dependent and neglected. By order of August 25, 2015, the trial court found La'Skylar to be dependent and neglected. DCS filed separate petitions to terminate Mother's parental rights to the children; these petitions were consolidated for hearing on July 23, 2015. By order of September 22, 2015, the trial court terminated Mother's parental rights to both children.

On August 17, 2015, prior to the entry of the order terminating her parental rights, Mother filed two form notices of appeal in the juvenile court. The first notice of appeal sought appeal of a "July" order to the "4th Circuit" court. On this notice of appeal, under "Type of Case," Mother checked two boxes, one for "Dependent and Neglect" and the other for "Parental Termination." Like the first notice of appeal, the second notice of appeal sought an appeal of a "July" order to the "4th Circuit" court but noted the "Type of Case" as "Parental Termination" only.

Although the circuit court had subject matter jurisdiction over the dependency and neglect appeal, it did not have jurisdiction over the parental termination appeal. Tennessee Code Annotated Section 37-1-159(c) provides that an appeal as of right from a termination of parental rights in the juvenile court shall be heard directly by the Court of Appeals. Ordinarily, a court without jurisdiction over a case "has no authority to transfer it, unless that authority is specifically conferred by statute, rule, or constitutional provision." ***Norton v. Everhart***, 895 S.W.2d 317, 319 (Tenn. 1995). However, as noted by Appellant in her brief, pursuant to Tennessee Code Annotated Section 16-4-108(a)(2),

when a case has been appealed to the wrong appellate court, the case shall be "transferred to the court having jurisdiction thereof." This Court has held that this statute applies even when, as in this case, a case originating in juvenile court was incorrectly appealed to the circuit court. *See Dalton v. Deuel*, No. M2005-02399-COA-R3-CV, 2007 WL 1241254, at *2 (Tenn. Ct. App. Apr. 27, 2007) (citing *In re Estate of White*, 77 S.W.3d 765 (Tenn. Ct. App. 2002)).

However, even if we allow, *arguendo*, that the circuit court lacked the authority to transfer this case to the Court of Appeals, we nonetheless conclude that Mother's second notice of appeal, filed in the trial court on August 17, 2015, was sufficient to confer jurisdiction over the parental termination appeal to this Court under Tennessee Rule of Appellate Procedure 3(a). As noted above, Appellant's notice of appeal from the parental termination case was filed in the juvenile court on August 17, 2015, which was prior to the entry of the trial court's September 22, 2015 order terminating her parental rights. Tennessee Rule of Appellate Procedure 4(d) provides that "[a] prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof." Accordingly, based strictly on the timing, Mother's notice of appeal is not invalid.

However, the fact remains that, substantively, Mother's notice of appeal did not denote the proper court to which she was appealing the judgment of the trial court. Tennessee Rule of Appellate Procedure 3(f) provides, in relevant part: "[t]he notice of appeal shall specify the party or parties taking the appeal…, shall designate the judgment from which relief is sought, and shall name the court to which the appeal is taken." Here, Mother's notice of appeal fails to comport with the requirements of Tennessee Rule of Appellate Procedure 3(f) in at least two regards. First, the notice of appeal references a "July" order as the order appealed; however, there is no July order in the record. Although the trial court heard the petition to terminate parental rights in July, the order terminating Mother's parental rights was not entered until September 22, 2015. Second, Mother's notice of appeal lists the wrong appellate court, i.e., the circuit court rather than the Court of Appeals. The question, then, is not, as DCS argues, one of timing, but rather one of sufficiency of the notice of appeal under Tennessee Rule of Appellate Procedure 3(f).

Although Tennessee Rule of Appellate Procedure 3(f) sets out specific criteria concerning the content of a notice of appeal, the rule also provides that "an appeal shall not be dismissed for informality of form or title of notice of appeal." The Advisory Comments expound on the rule, stating that "[t]he purpose of the notice of appeal is simply to declare in a formal way an intention to appeal. As long as this purpose is met, it is irrelevant that the paper filed is deficient in some other respect." Here, there is no question that DCS was on notice that it would need to defend an appeal of the order terminating Mother's parental rights. As this Court has noted, the notice of appeal functions as a device to alert other parties in the case that the decision is being appealed.

When describing a case involving the modification of a parent's visitation to allow a divorced parent to move out of state, wherein the father erroneously filed his appeal to the circuit court instead to the Court of Appeals, this Court stated that

> the appellant's failure to name the court to which the appeal was being taken did not compromise the effectiveness of the notice in alerting the appellees that the appellant intended to seek further judicial review of the trial court's judgment.

*Howse v. Campbell*, No. M1999-01580-COA-R3-CV, 2001 WL 459106, at *3 (Tenn. Ct. App. May 2, 2001) (discussing *Searle v. Pfister*, No. M2000-00731-COA-R3-CV, 2000 WL 1862841, at *3-4 (Tenn. Ct. App. Dec. 21, 2000)). The Tennessee Court of Appeals has the discretion to waive "defects in the contents of the notice [of appeal]." *Searle*, 2000 WL 1862841, at *3. In a similar case involving termination of parental rights, *In re B.N.J.*, this Court exercised its discretion under Tennessee Rule of Appellate Procedure 2, *infra*. *In re B.N.J.*, No. M2008-02442-COA-R3-PT, 2009 WL 4017161, at *3 (Tenn. Ct. App. Nov. 19, 2009). *In re B.N.J.* involved a defective notice of appeal, which omitted the case name, trial court docket number, and the court to which the case was appealed. *Id.*, at *3. Nevertheless, this Court exercised its discretion, under Tennessee Rule of Appellate Procedure 2, to proceed with the appeal on the merits, stating:

> Tennessee Rule of Appellate Procedure 2 permits this Court to suspend the requirements or provisions of any of the rules of appellate procedure for good cause… Because of the gravity of a proceeding to terminate the rights of a parent and the fact that the parties had notice of [the parent's] intent to appeal before and after the entry of the final judgment, we do not find it appropriate under the circumstance to deny [the parent's] right to appeal the judgment of the trial court.

*Id.* at *4. Like the *B.N.J.* case, Mother's notice of appeal, even though it was deficient, was sufficient to "declare in a formal way an intention to appeal." *Id.* (citing Tenn. R. App. P. 3(f)). Here, as in *B.N.J.*, "[t]he notice evidently achieved this purpose as both the trial court and the clerk of this Court knew which case was being appealed." *Id.* Additionally, DCS undisputedly received notice of Mother's filing of the notice of appeal, thus providing notice of the appeal of the termination of parental rights. Like *B.N.J.*, this appeal implicates the same "gravity of a proceeding to terminate the rights of parent." *Id.* Accordingly, we exercise our discretion under Tennessee Rules of Appellate Procedure 2 to waive the formal requirements for notices of appeal under Tennessee Rule of Appellate Procedure 3(f), and we exercise jurisdiction over the appeal.

### V. Ground for Termination

In terminating Mother's parental rights, the trial court relied solely on the ground

of mental incompetence. Each ground for termination of parental rights must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re D.L.B.*, 118 S.W.3d at 367; *In re Valentine* 79 S.W.3d at 546. The ground of parental mental incompetence is found at Tennessee Code Annotated Section 36-1-113(g)(8), which provides:

> (8)(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
>
> > (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
> >
> > (ii) That termination of parental or guardian rights is in the best interest of the child;
>
> (C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated.

In relying on this ground for termination of Mother's parental rights, the trial court found

> that [Appellant] is incompetent to adequately provide for the further care and supervision of the children because [Appellant]'s mental condition is presently so impaired and is so likely to remain impaired that it is unlikely that [Appellant] will be able to assume the care of and responsibility for the children in the near future.
>
> The fundamental question before this Court is whether the mother can reason well enough to make important decisions for this child. Some of the factors the Court considered in arriving at its conclusion include her IQ scores, the uncertainty regarding her abilities expressed by Dr. MacGillivray and The Solution Source in their clinical evaluations, and the conclusive findings of the two professionals who actually observed [Appellant] attempting to care for her children. [Appellant] has completed a lot of different steps, but the big step is being able to demonstrate that she "gets it" and that she will "get it" in the future. This Court does not believe she can.

Turning to the record, it is undisputed that Mother's IQ is 66. This IQ score was described by Mother's psychologist as "very limited intellectually… she is likely to continue to have serious problems living independently, let alone caring for her child." In the parenting assessment, counselors who observed Mother during supervised visitation stated, in relevant part, that:

> [Mother's] quest to get her own emotional and physical needs met has prevented and continues to prevent her from being accurately attuned to, anticipating, acknowledging and appropriately meeting her daughter's needs…. [Mother and La'Trianna's] emotional connection does not translate into an ability on [Mother's] part to adequately parent her child…. [Mother's] cognitive and emotional deficits prevent [Mother] from being able to appropriately and effectively parent [her] daughter in any other than a supported, supervised setting. Supervised visitation in a contained environment is needed for Ms. [W.] to ensure La'Trianna's emotional and physical safety and well-being as it is highly unlikely that enough change would or could be made by [Mother] to enable her to safely care for her daughter due to her limitations.

At the hearing on the petitions to terminate Mother's parental rights, both Ms. Burke, Mother's DCS case manager, and Ms. Goldstine, testified that Mother placed herself in unsafe situations by bringing men to live in her home after meeting them on the street and at bus stops and that Mother did not comprehend why this behavior threatened her own safety, as well as the children's. Ms. Burke stated that Mother "didn't see the safety concerns… that she wanted to have a social life and a boyfriend, so she didn't see why we were concerned." Furthermore, Ms. Goldstine testified that,

> in [Mother's] quest to get her emotional needs for intimacy and connection met, she places herself in situations which lead her to become very quickly engaged in sexual liaisons with men who[] she doesn't know and then provides her reasoning for doing so and minimalizing any potential harm to herself or her child.

Renee Stegall, a therapist who supervised the interaction between Mother and the children, stated that Mother should not have unsupervised time with the children. Even in her own testimony, Mother conceded that her apartment is not safe for the children, because of the men who come around the apartment. Despite this admission, the record indicates that Mother does not understand that her behavior is dangerous and poses a safety risk to the children.

Nonetheless, Mother raises three arguments as to why the trial court erred in finding her to be mentally incompetent to care for the children: (1) the parenting assessment did not consider that Mother cooperated with the counselor's instructions; (2)

the psychological assessment was not sufficiently definite that Mother could not parent the children; and (3) Mother has support from other family members, which compensates for her own mental challenges in raising the children.

As to the first of Mother's arguments, Ms. Goldstine testified that Mother followed her instructions and cooperated in clinical sessions. However, Ms. Goldstine stated that

> [Mother's] decisions that she makes to get her own emotional and physical needs met put a child in jeopardy or at risk of harm. And in having conversations with her about those choices, she did not seem to possess an understanding of why those choices, meeting men, picking them up at the bus station and bringing them home and engaging in sexual relationships with them without having any knowledge about them, would place her child at risk of harm.

Ms. Goldstine's opinion was developed after two-and-one-half months of interviews with and observations of Mother. From Ms. Goldstine's testimony, although Mother cooperated with the assessments, she failed to comprehend the purpose of the assessment, which was to help her to understand how her choices affected the children and to aid in her ability to make better parenting decisions.

Mother's second argument rests on the psychological assessment conducted by Dr. William A. MacGillivray, which states, "it is too soon to conclude, on the basis of information I have been given, that [Mother] is unable to parent her child." Mother contends that this opinion indicates that the psychological assessment was inconclusive as to Mother's mental competence to parent the children. At the hearing, Dr. MacGillivray did not testify, but Ms. Goldstine testified regarding her review of Dr. MacGillivray's assessment as follows:

> Q. In the psychological evaluation of the mother that was completed by Dr. MacGillivray –
> A. Uh-huh.
> Q. – he had stated that ["]concerning her ability to parent her child, I would conclude that further information would be needed to assess her day-to-day ability to attend to her child's needs.["] Do you feel like that your evaluation has filled that blank in?
> A. Yes.
> Q. And then your conclusion after observation is that she doesn't have the ability to tend to the day-to-day needs of her child; would that be correct?
> A. Correct, because she's busy trying to attend to her own basic needs.

- 11 -

Although Mother argues that Dr. MacGillivray's testimony (i.e., that "it is too soon to conclude, on the basis of information I have been given, that [Mother] is unable to parent her child.") should be given more weight than Ms. Goldstine's opinion that Mother cannot parent the children, Ms. Goldstine's testimony, unlike Dr. MacGillivray's testimony, is corroborated by other testimony in the record. For example, DCS case manager, Ms. Burke, testified that Mother stated that she moved strangers into her apartment because "she wanted to have a social life, that she gets bored, that she wants to have a love life as well" and that "[s]he didn't really understand why it was a safety concern to move in a stranger or even why we did background checks of why that was concerning." From the record as a whole, it is clear that the weight of the evidence shows that Mother's mental incompetence is not simply an intellectual deficiency, but rather an impairment to her understanding that her needs for socialization and intimacy cannot take precedence over the children's safety.

As to Mother's parenting skills, counselors who worked with Mother during therapeutic visitation with the children, stated that Mother's mental incompetence hindered her interaction with the children. For example, Ms. Stegall testified that

> [Mother's] struggle was remaining engaged with her child, not understanding the age appropriate limitations that La'Trianna had during the visits, expecting her to do more than she was able to do…. She changed the baby's diaper excessively. During the last visit I had tried to educate her on the importance of maintaining a schedule for the baby because foster mom had indicated that she would eat at a later time, mom tried to feed her early.

Ms. Stegall also testified that Mother had to be prompted at every visit to use the foster mother's formula instead of a formula that Mother brought, with Mother complaining to Ms. Stegall that formula is not breast milk. Mother testified that she had not learned anything in her educational therapy with Ms. Goldstine and Ms. Stegall because, after having La'Trianna, she already knew everything about parenting.

As to Mother's final argument concerning family support, Mother relies on *State Dept. of Children's Services v. Whaley*. No. E2001-00765-COA-R3-CV, 2002 WL 1116430 (Tenn. Ct. App. May 30, 2002), in support of her contention that a mentally incompetent parent, with a support system, may not have his or her parental rights terminated on the grounds of mental incompetence. In *Whaley*, this Court did not make such a bright-line rule; rather, we considered "factors" concerning whether a parent "by clear and convincing evidence… is incompetent to such a degree that she is unable to care for her child now or that she will be unable to care for [the child] in the future." *Id.* at *14. In *Whaley*, mother was diagnosed as mildly intellectually disabled, and mother's neighbor, a retired teacher, provided support to mother and volunteered to assist mother in raising the child. *Id.* at *8. To this end, the neighbor also allowed mother and child to

move into her home. *Id.* In deciding the appeal, this Court considered the evidence, including that the mother had completed vocational training, had properly regulated and administered her own prescription medications, had obtained a job, and was able to use public transportation to get to work and appointments. *Id.* at *14. These factors, combined with the fact that mother had not only a support system, but also a willing foster parent, led this Court to conclude that the State had failed to show, by clear and convincing evidence, that mother was mentally incompetent to provide care and supervision for the child. *Id.*

The instant case differs factually from *Whaley*. Although Mother argues that she has support from her grandmother, Luzanna W, Mother's own testimony casts doubt as to whether Mother will remain in Luzanna W.'s home.[4] Although Luzanna W. testified that Mother can live with her free of charge, Mother continues to maintain an apartment, where her possessions are located. The record indicates that, in the past, Mother has been transient, moving from her apartment, to her grandmother's house, to La'Trianna's father's residence, and back to her apartment. Mother's apartment, as described by Mother, is "not safe." Where the mother in *Whaley* was able to complete vocational training and maintain employment, our record does not show that Mother has the capacity to navigate employment. Here, Mother has not returned to her vocational training class, which she left incomplete after she became pregnant with La'Skylar. Although Mother testified that she began an online sales job (at midnight prior to the hearing), she could neither recall the name of the company nor supply any details to the trial court. Mother's IQ is 66, and her psychological report indicates that she is "very limited intellectually." The record shows that her intellectual limitations extend to her ability to learn proper parenting skills. As discussed above, several expert witnesses testified that Mother should not be unsupervised with the children, as she requires prompting and is unable to retain information (even short-term) concerning proper parenting skills. Perhaps most troubling, however, is Mother's pattern of making dangerous decisions in meeting men and moving them into her apartment without understanding that these decisions threaten not only her own safety, but also the children's safety. As the trial court found in its order:

> [Mother] has consistently failed to see how moving strangers into her home could be a safety risk to herself and her child. When confronted, she has responded that she was bored, she wanted to have a boyfriend and a social life and didn't see why anybody was concerned.

From the totality of the circumstances, we conclude that there is clear and convincing evidence that Mother is mentally incompetent to provide adequately for the future care

---

[4] There is dispute in the record as to the proper spelling of Luzanna W.'s name. For consistency and clarity, we will use the spelling set out in the parties' appellate briefs and the transcript, "Luzanna W."

- 13 -

and supervision of the children.

## VI.  Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest.  *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994).  When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge.  *In re Audrey S.*, 182 S.W.3d at 877.  The focus shifts to the child's best interest.  *Id.* at 877.  Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest.  *Id.*  However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child.  Tenn. Code Ann. § 36-1-101(d).  Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective."  *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

* * *

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe....
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from

effectively providing safe and stable care and supervision for the child....
Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

In its order, the trial court made several findings regarding the children's best interests. With regard to the first and second factors, i.e. whether the parent has made lasting adjustments so as to make the home safe for the children, the trial court found

> [Mother] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in her home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible.

Concerning the third factor as to visitation, the trial court stated that "[Mother] has maintained regular visitation with the children but that visitation is now problematic for La'Trianna." As to the fifth factor, i.e., the effect of a change in caretakers and physical environment from the foster family to Mother, the trial court found that "[a] change of caretakers and physical environment is likely to have a detrimental effect on the children's emotional and psychological condition." In discussing the sixth factor, the trial court found that "[Mother] has shown neglect toward La'Trianna and remained in the home with that child's father despite his abuse." For the seventh factor, the safety of the parent's home, the trial court found that:

> [Mother has] remained in the home with that child's father despite his abuse. She has an apartment of her own, but has failed to demonstrate that it would be a safe place for her children. She is currently residing in the crowded home of her grandmother but there is no guarantee that she will

- 15 -

remain there long-term.

Finally, as to the eighth factor, which refers to the effect of the parent's emotional or mental state on the parent's ability to care for the child, the trial court stated that "[t]he primary issue is that [Mother]'s mental and/or emotional status would be detrimental to the children or prevent [Mother] from effectively providing safe and stable care and supervision for the children."

As discussed above, the record indicates that Mother struggles with proper parenting skills in terms of dividing her attention and time between the children and providing appropriate parenting and care. Several counselors testified that they would not recommend that Mother have unsupervised visitation with the children. Additionally, from the evidence adduced at the hearing, it is clear that Mother fails to understand the safety concerns arising from her decision to move men into her apartment after knowing them for only a short time. Furthermore, Mother has not demonstrated that she would be able to provide a safe home environment for two children. At the hearing, Mother agreed that her apartment is unsafe.

The record shows that La'Trianna and La'Skylar are flourishing in their foster home. Ms. F., the children's foster mother, testified that La'Trianna identifies herself verbally as part of the foster family and that she has bonded with her sister in the foster home. Ms. F. stated that she was willing to adopt both children. Ms. F. stated that La'Trianna had recently begun wetting her bed after visitation with Mother and that La'Trianna left supervised therapeutic visitation with Mother by greeting Ms. F. as her mother and running to her with outstretched arms. Accordingly, there is evidence to suggest that a change in caregivers, at this point, would cause emotional and psychological distress to the children.

From the totality of the circumstance, Mother displays significant difficulty in retaining and implementing proper parenting skills. More concerning, Mother fails to understand that her lifestyle, including the array of people living in her apartment, threatens the wellbeing and safety of the children. Mother is unable to comprehend that, by putting her needs for emotional and physical intimacy before the needs of the children, she endangers them. Accordingly, we conclude that there is clear and convincing proof to support the trial court's finding that termination of parental rights is in the children's best interests.

## VII. Conclusion

For the foregoing reasons, the order of the trial court, terminating Appellant's parental rights to the children, is affirmed. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal

are assessed to the Appellant, La'Treese W. Because La'Treese W. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____

KENNY ARMSTRONG, JUDGE